## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT GREENVILLE

| | | |
|---|---|---|
| PATTYE BURNETTE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| THE GUARDIAN LIFE INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## COMPLAINT FOR RECOVERY OF PLAN BENEFITS AND FOR THE ENFORCEMENT OF RIGHTS UNDER ERISA

**COMES NOW**, Plaintiff Pattye Burnette, and makes the following representations to the Court for the purpose of obtaining relief from Defendants' refusal to pay long-term disability benefits due under an employee benefits plan under ERISA, and for Defendants other violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

## JURISDICTION AND VENUE

1. This Court's jurisdiction over the Plaintiff's claims for long term disability benefits is invoked under federal question jurisdiction pursuant to 28 U.S.C. § 1331 and under the express jurisdiction found in the ERISA statute under 29 U.S.C. § 1132(e) (ERISA § 5-2(e)).

1

2. Plaintiff's claims "relate to" an "employee welfare benefits plan" or "plans" as defined by ERISA, 29 U.S.C. § 1001 *et seq*., and the subject disability benefit plans constitutes a "plan under ERISA."

3. The ERISA statute, at 29 U.S.C. § 1133, as well as Department of Labor regulations, at 29 C.F.R. § 2569.503-1 provide a mechanism for administrative or internal appeal of benefits denials.

4. In this case, the aforementioned avenues of appeal have been exhausted and this matter is now properly before this court for judicial review.

5. Venue is proper within the Eastern District of Tennessee pursuant to 29 U.S.C. § 1132(e)(2).

## PARTIES

6. During the relevant period, Plaintiff, Pattye Burnette (hereinafter "Plaintiff" or "Ms. Burnette"), was a resident of the City of Bristol, County of Sullivan, State of Tennessee, though she has recently moved to Bristol, Virginia.

7. During the relevant period, a significant portion of Plaintiff's medical treatment occurred in Johnson City, Tennessee.

8. Plaintiff alleges upon information and belief that First Communities Management, Inc. Plan (hereinafter "Plan") is, and at all relevant times was, an "employee welfare benefit plan" as defined by ERISA.

9. The Plan provides eligible employees with disability income protection as defined by the Plan.

10. Plaintiff alleges upon information and belief that First Communities Management, Inc., is the Plan Sponsor and Plan Administrator Plan.

11. First Communities Management, Inc., and/or the Plan additionally maintained or contained other benefits and/or component plans under which Plaintiff may be entitled to benefits if found disabled under the long-term disability Plan.

12. Plaintiff alleges upon information and belief that Defendant The Guardian Life Insurance Company of America (hereinafter "Guardian") is the party obligated to pay benefits and to determine eligibility for benefits under the Plan and is an insurance company authorized to transact the business of insurance in this state.

13. Guardian is the underwriter for Group Policy Number G-00521808 and may be served with process by and through the Commissioner of the Tennessee Department of Commerce and Insurance, 500 James Robertson Parkway, Suite 660, Nashville, Tennessee 37243-1121, and at its principal pace of business located at 7 Hanover Square, New York, New York 10004.

## FACTS

14. Defendant Guardian was the entity responsible for processing claims and adjudicating appeals regarding long-term disability benefits under the Plan.

15. The long-term disability Plan is fully insured by Guardian under Group Policy Number G-00521808.

16. The Plaintiff timely filed an application for benefits under the Plan, was subsequently denied benefits, Plaintiff timely appealed, and Guardian issued its final denial on September 21, 2022.

17. The Plaintiff was employed as a Head Leasing Agent by First Communities Management, Inc., since July of 2010, at its location in Johnson City, Tennessee, and as such, Plaintiff was thereby a participant or beneficiary of the Plan, and is covered by the policy that provides benefits under the Plan.

18. The Plaintiff ceased work on or about October 21, 2018, due to a disability while covered under the Plan.

19. The Plaintiff has been and continues to be disabled as defined by the provisions of the Plan.

20. In accordance with the review procedures set forth in the Plan, 29 U.S.C. § 1133, and 29 C.F.R. § 2560.503-1, Plaintiff appealed the claim until exhausting the required plan appeals.

21. Having submitted her appeal, and as confirmed by Guardian, Plaintiff

4

exhausted her administrative remedies.

22. Based on the terms of the insurance policy, Plaintiff's complaint is timely and is not otherwise time barred.

23. Plaintiff is entitled to long term disability benefits as she has met the long-term disability Plan's requirements, and her disability prevents her from performing on a full-time basis, the major duties of her own occupation, and then, after 24 months of eligibility, from performing on a full-time basis, the major duties of any gainful work. Gainful work is defined as work for which Plaintiff is, or may become, qualified by training, education, or experience, and is at least 60% of Plaintiff's indexed insured earnings within 12 months of returning to work.

24. If disabled pursuant to the terms of the policy, Plaintiff, who was paid long-term disability benefits from January 30, 2019 to March 29, 2021, and who is entitled to a gross long-term disability benefit of $1,591.00 per month, offset by a Social Security primary benefit of $995.00 per month (there are no auxiliary beneficiaries), for net long-term disability benefit of $596.00 per month from March 30, 2021 to May 25, 2034, such that she is entitled to $10,810.08 in back benefits, $68,476.47 in future benefits (using 3.50% to discount to present value) with an overpayment of $522.09 owed, for a total long-term disability benefit of $78,764.46.

5

25. Evidence submitted by Plaintiff to Guardian supporting her disability includes, *inter alia*, the following: On April 28, 2021, Angel Nofziger, ANP-BC, completed a physical capacity evaluation for the Guardian. It was indicated that Ms. Burnette suffered from chronic fatigue, chronic pain, neuropathy, headaches, IBS, insomnia and fibromyalgia. She could sit and stand for about 30 minutes and walk for about 5 minutes. She could occasionally lift, carry, push and pull up to 10 pounds. She was unable to perform fingering/keying or pushing/pulling arm controls. Ms. Burnette could never kneel or climb ladders, could occasionally bend/stoop, squat/crouch, crawl, climb stairs and drive, and could frequently reach out and reach above shoulder on her left side. She was not able to work at heights, operate heavy machinery, maintain balance, have exposure to vibration, marked temperature chances or to dust, fumes, gases or chemicals. Ms. Burnette also suffered side effects from her medication regimen which caused double vision, dizziness and nausea. The assessed restrictions were deemed permanent.

26. About seven months later, on November 11, 2021, Nofziger authored a medical source statement. She indicated she was treating Ms. Burnette for fibromyalgia as well as Lyme disease, chronic fatigue syndrome, headaches, adrenal fatigue, insomnia, neuropathy and IBS. It was also noted that Ms.

Burnette received treatment for chronic spinal conditions including spinal stenosis, disc desiccation and disc protrusion through physical therapy and chiropractic treatment. Nofziger said her patient has difficulty sitting longer than 5 minutes because of the neuropathy in her legs which caused increased pain in the still and sitting position. Additionally, Ms. Burnette could only stand for 3 minutes or so before needing to sit or lay down or find a more comfortable position due to the pain in the muscles and nerves from fibromyalgia as well as her spinal condition. She was also advised not to do any lifting. Nofziger said there was not a foreseeable return to work date because the chronic conditions had yet to show improvement.

27. On November 22, 2021, Pamela Costello, M.D., a neurosurgeon, sent a letter to the Guardian. Dr. Costello noted she was a career operating neurosurgeon, a published neuroscientist specializing in neuroinflammatory illness, as well as a certified doctor of environmental and biological medicine. Dr. Costello indicated Ms. Burnette was referred to her by her primary care physician, Kimberly McMurtery, M.D., in September of 2021, for a neurological and environmental medicine evaluation of presenting illnesses including chronic, tertiary Lyme disease. Ms. Burnette presented with associated fibromyalgia with diffuse, intractable chronic pain syndrome with myalgias, neuralgia, spinal pain and arthralgias, neuropathic pain of the

7

hands and feet, central tremors, cranial cervical instability with associated brain cognitive dysfunction, malaise, headaches and balance issues. She also suffered chronic upper respiratory infections with C. pneumonia, mycolplasma pneumonia, and with chronic gastritis and dysbiosis with high candida or fungal systemic overgrowth. Her laboratory workup done as part of the workup confirmed the aforementioned clinical serology findings. Ms. Burnette has serological confirmation of autoimmune issues, manifesting as pan-glandular dysfunction of the thyroid, parathyroids and reproductive organs. She has had surgical removal of her ovaries and uterus in 2016, parathyroid gland removal in 2018, and ongoing medical management of Hashimoto's thyroiditis. Dr. Costello said her patient's presenting clinical symptoms of diffuse myalgias, arthralgias, cervical spine dysmobility and pain, neuropathy, chronic fatigue and malaise indicate extensive neuroinflammatory illness which contributes to moderate to severe chronic intractable pain, poor energy or activity tolerance, including substantial compromise with limited ability to perform her activities of daily living. Dr. Costello said it was her professional opinion that Ms. Burnette is not a candidate to return to any form of gainful employment and is without the expectation of significant recovery in the foreseeable future.

28. Ms. Burnette has also thoroughly described to the Guardian how her

disability impacts her life. She is not able to drive every day or for an extended period of time because of her pain. She is usually only able to drive to her doctors' appointments and to get medications. She might cook once or twice a month. She occasionally trIes to help her family with cleaning but she is unable to do it for very long and when she does do it she will pay for her activity in pain later that day or over the next few days. If she does laundry or cook on a particular day, she would consider it a good day. She almost never goes out to eat. She stays in bed most days and has only about 1-2 good days a month.

29. Additionally, individuals familiar with Ms. Burnette's impairments also provided the Guardian with statements. Her daughter-in-law, Callie Burnette, said she misses many family functions because she is not able to get out of bed, sometimes because she is exhausted from not being able to sleep the previous night. Callie gave an example where her mother-in-law went to a petting zoo and they took a little tour that required some walking. Ms. Burnette had to get assistants with a golf cart and had to stay behind the group. She also took a scooter with her in case she got too tired from standing. Callie noted that if Ms. Burnette does try to push herself physically then it backfires and she has rest for the next few days to recover.

30. Ms. Burnette's sister, Lynn Carroll, also provided firsthand knowledge of

her impairments. Ms. Carroll said her sister has been suffering a physically and mentally disabling disease for several years. The physical ailments are noticeable every day. The mental toll is worse. She has trips to the emergency room, surgeries and procedures, and multiple treatments with various physicians with no determination of how to return her to her active lifestyle. She has constant headaches, continuing issues with pain in her arms and legs, and cannot exert herself for long periods. Ms. Carroll notes that prior to her disability, Ms. Burnette was very active. She enjoyed hiking, taking photographs with her husband, attending events and had a full time where she was awarded the best apartment sales person of the year for several years. Now she cannot hold a job that would require her to sit or stand for any period of time. She does not sleep much anymore because she cannot get comfortable lying down. Although she tries to have good days where she leaves the house, she does not have the stamina to do anything for very long and she is apprehensive about doing things because she anticipates that she will simply wear out.

31. Ms. Burnette's son, Matthew Burnette, gave additional information about his mother. He said even things as simple as getting groceries from the car to the house is a challenge for her. Sitting and walking for an extended period causes a lot of pain and makes her uncomfortable. Matthew noted that his

mother cannot hold her 1 year old granddaughter without her arms hurting. In fact, if her grandchildren want her to play with them, she is unable to do so without becoming fatigued and requiring frequent breaks to sit down and rest.

32. Furthermore, one of Ms. Burnette's acquaintances, Susan Cavenaugh, talked about her impairments. Ms. Cavenaugh said Ms. Burnette's ability to complete daily chores was difficult at best because her motor skills had decreased. The loss of feeling in her hands and feet resulted in her having difficulty or even needing to forego simple chores like loading/unloading dishes in the dishwasher, picking up items to dust the furniture, carrying groceries to and from the car, folding laundry, cooking, and typing on her computer. Ms. Cavenaugh also noticed that Ms. Burnette's cognitive skills have decreased as well. She has trouble completing some conversations due to an inability to recall details and facts. Additionally, Ms. Burnette has trouble sitting or standing in one position for very long with limits her ability to travel in a car. This has caused problems with her ability to visit her very elderly grandmother as well as other members of her family. She often defers errands like shopping until someone can drive for her. She no longer travels overseas for missionary outreaches for which she had a great passion. Indeed, her energy level has decreased to the point that she

11

frequently rests or takes naps after shopping for groceries or completing doctor appointments. The constant pain she had keeps her from participating as a member of her worship team and she often is not physically able to attend church services.

33. Benjamin Kretzmann, M.D., a medical consultant for Guardian via Exam Coordinators Network, a division of Genex Services, LLC, indicated Ms. Burnette has a medical history significant for fibromyalgia, history of Lyme disease exposure, primary generalized osteoarthritis, paresthesia, hiatal hernia, systemic candidiasis, inflammatory bowel syndrome, and long-term current drug therapy. The pertinent diagnoses were chronic pain, chronic fatigue, fibromyalgia, Lyme disease, polyneuropathy, anxiety and depression. Dr. Kretzman said that Ms. Burnette has a variety of conditions that are contributing to her overall symptoms of diminished tolerance to prolonged positions and decreased energy level. Her present limitations are compounded by fibromyalgia, Hashimoto's thyroiditis, and paresthesia. She also has other comorbidities including system candidiasis, inflammatory bowel syndrome and hiatal hernia, as well as symptoms of gastroesophageal reflux disease. Although she showed some improvement in her problems after treatment, she still has certain limitations that will hinder her capacity to conduct activities. Overall, due to the evident physical impairments, Dr.

Kretzman recommended the following limitations as of January 30, 2021: sitting constantly up to 45 minutes at a time for up to 6 hours per day; standing frequently up to 30 minutes at a time for up to 4 hours per day; walking occasionally up to 15 minutes at a time for up to 2 hours per day; lifting, carrying, pushing, and pulling occasionally up to 10 pounds with BUE; occasional climbing stairs, balancing, stooping, kneeling, crouching, crawling; reaching occasionally overhead/below desk level BUE and unrestricted desk level BUE; using lower extremities for foot controls frequently BLE; fine manipulation frequently BUE; simple and firm grasping frequently BUE; and no climbing ladders or operating heavy machinery. Dr. Kretzmann also indicated that the test results and data from the file review do not suggest a disparity between measurable findings and self-reported complaints. He agreed that Ms. Burnette exhibited symptoms of widespread pain and fatigue, which are consistent with her diagnoses of fibromyalgia and primary generalized osteoarthritis. Dr. Kretzman said Ms. Burnette's medication regimen was appropriate, and consisted of pregabalin, prednisone, Colchicine, vasculera, duloxetine, hydroxycholoroquine, Plaquenil, NP thyroid, Tizanidine, and Lyrica. He thought her treatment plan had been consistent with professional standards of care.

34. Arnold Lentnek, M.D., a medical consultant for Guardian via Exam

Coordinators Network, a division of Genex Services, LLC, indicated Ms. Burnette had a medical history significant for anxiety, depression, hypothyroidism – Hashimoto's thyroiditis, osteoporosis, thyroid nodule, fibromyalgia, Lyme disease, neurology and symptoms of chronic pain and fatigue. Dr. Lentnek thought that the diagnoses of neuropathy, fibromyalgia and osteoporosis were not supported by objective information. Indeed, Dr. Lentnek said Ms. Burnette has no restrictions or limitations as of January 30, 2021. Dr. Lentnek also felt that the test results and data from the file review suggested disparities between measurable findings and self-reported complaints. He also thought her treatment plan had not been consistent with professional standards of care.

35. Ignoring evidence of pain, fatigue or other disabling conditions because they are subjective is arbitrary and capricious. *Miles v. Prudential Life Insurance Co.*, 720 F.3d 472, 486 (2d Cir. 2013). This is precisely what Guardian's medical consultants did. Significantly, there is no provision in the policy which limits benefits based on an insured's subjective reports or complaints.

36. An ability to perform the material and substantial duties of any fulltime occupation requires reliability, consistency, substantial capacity, psychological stability, and steady attendance. *Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir. 1980); *Tippitt v. Reliance Std. Life Ins. Co.*, 457 F.3d

1227, 1236 (11th Cir. 2006); *McIntyre-Handy v. APAC Customer Services, Inc.*, 2005 WL 5369158, *6 (E.D. Va. 2005); *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994). Guardian's medical consultants provided no meaningful analysis on any of these issues.

37. Job preclusive vocational limitations include, *inter alia*, needing additional, unscheduled work breaks, being off task more than 10% of the work period, and/or being chronically absent. *Johnson v. Saul*, 2019 WL 6876012, at *3 (E.D.Mo., 2019); *Ricardo C. v. Saul*, 2019 WL 4034484, at *2 (N.D.Ill., 2019); *Hicks v. Commissioner of Social Security*, 2016 WL 2605234, at *4 (E.D.Mich., 2016); *Mershad v. Commissioner of Social Security*, 2016 WL 659307, at *12 (S.D.Ohio, 2016); *Coffman v. Commissioner of Social Security*, 2015 WL 9311522, at *3 (E.D.Mich., 2015); *Williams v. Commissioner of Social Sec.*, 2013 WL 3771381, at *6 (E.D.Mich., 2013). Guardian's medical consultants provided no meaningful analysis on any of these issues.

38. There is no requirement that the insured provide *only* objective medical evidence or other objective indica of disability. Since the policy does not say it, Guardian does not have the authority to require it. *See*, *e.g.*, 29 U.S.C. § 1104(a)(1)(d); *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S.Ct. 2459, 2468 (2014), *Salomaa v. Honda*, 642 F.3d 666, 678 (9th Cir. 2011);

*Carradine v. Barnhart,* 360 F.3d 751,755 (7th Cir. 2004); *Abdullah v. Accentcare Long Term Disability Plan*, 2012 WL 4112291 *11 (N.D. Cal); *Krupp v. Liberty Life Assurance Company of Boston*, 936 F.Supp.2d 908, 917 (N.D. Ill. 2013).   Guardian's medical consultants mostly dismissed Ms. Burnette's subjective complaints out of hand without meaningful analysis. This was unreasonable.

39. The relevant policy allows for independent medical examinations and functional capacity examinations.   Guardian failed to conduct any such examinations.   All of Guardian's opinions come from file reviews.   Non-examining evidence has little value in evaluating pain, fatigue or impaired focus, concentration or cognition. *See*, *e.g.*, *Kalish v. Liberty Mutual*, 419 F. 3d 501, 508 (6th Cir. 2005); *Calvert v. Firstar Finance, Inc.*, 409 F. 3d 286, 295 (6th Cir. 2005); *Smith v. Aetna*, 312 F. Supp. 2d 942, 954 (S.D. Ohio 2004); *Meyer v. MetLife*, 341 F. Supp. 2d 865 (S.D. Ohio 2004); *Black v. Guardian Life Insurance Company of America*, 324 F. Supp. 2d 206, 215 fn.8 (D. Me. 2004).

40. Guardian, as an ERISA fiduciary, will have to show it exercised care, skill, prudence, diligence, and loyalty solely for the benefit of Plaintiff like that borne by a trustee under common law.  *See* § 1002(21)(A)(i) and (iii); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220, 124 S. Ct. 2488, 2502 (2004);

16

*Mondry v. Am. Fam. Mut. Ins. Co.*, 557 F.3d 781, 803 (7th Cir.), *cert. denied*, 130 S. Ct. 200 (2009).  Guardian's denial of Plaintiff's long-term disability benefits is itself evidence that it failed to behave as a fiduciary in the instant matter.

41. Guardian relied on third party vendors, including Exam Coordinators Network (Dr. Kretzmann and Dr. Lentnek), to conduct file reviews during the administrative appeal of Ms. Burnette's disability claim and medical consultants working for said vendors opined, *inter alia*, that she had minor impairments which had no meaningful impact on her functionality without addressing her work reliability, consistency, substantial capacity and steady attendance.

42. With respect to Exam Coordinators Network, it is a division of Genex.  In 2010, Genex bought the Life Insurance of North America's disability case management business. At one time Genex's website provided context for its "cost cutting" mission and the fact that it only serves the insurance industry: "For over 30 years, Genex has been the recognized industry leader for managing disabilities" and "Genex's Disability…Absence Management Services provide high-quality, customizable services driven by specialized disability management expertise to help payers reduce claims costs…" and "Specialized, customizable services delivered by in-house disability experts

help you reduce claims costs…"  *See*, *e.g.*, *Jones v. Life Insurance Company of North America*, Case No. 2:19-cv-04669-DLR (D. Ariz.).

43. Guardian's policy contained an "offset" provision that required Ms. Burnette to apply to the Social Security Administration for benefits. If she won her Social Security case, then not only are future benefits from the Guardian reduced by the amount of the monthly check from Social Security, but to the extent that any back benefits from Social Security overlap with benefits the Guardian has already paid, the Guardian gets to recoup these benefits from Ms. Burnette.  Ms. Burnette has applied for and received her Social Security disability benefits.

44. There are no challenges to Ms. Burnette's credibility. In other words, Ms. Burnette's treating physicians have directly addressed her reliability, consistency, substantial capacity, psychological stability and steady attendance.  The Guardian and its medical consultants have failed to substantively account for, much less address, any of these issues.  Neither the Guardian nor its medical consultants has substantially assessed or addressed that fact that due to her chronic pain, fatigue, and diminished concentration or memory, that Ms. Burnette would be off task more than 10% of any given workday, would need more breaks than competitive employers allow, and would be chronically absent from work.  These

limitations – individually – would rule out all work. Accordingly, Ms. Burnette has satisfied her obligations of providing proof of her physical disability under the policy.

45. The Plaintiff has now exhausted her required administrative remedies for her long-term disability benefits under the Plan pursuant to ERISA or such administrative remedies are deemed exhausted and/or her long-term disability benefits are deemed denied.

46. The Court's standard of review for the ERISA claims is *de novo* under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

47. The entity that chose to deny long term disability benefits would pay any such benefits due out of its own funds.

48. Defendant Guardian was a claims decision-maker under a perpetual conflict of interest because the long-term disability benefits would have been paid out of its own funds.

49. Defendant Guardian allowed its concern over its own funds to influence its decision-making.

50. Defendant has acted under a policy to take advantage of the potential applicability of ERISA to claims.

51. Guardian's administrative process did not provide Plaintiff with a full and fair review; by way of example, Guardian's denial letters did not contain the

19

specific reasons for the denial and did not advise Plaintiff of the information Guardian required in order to approve her continuing benefits.

52. The disability insurance policy does _not_ provide Guardian with discretionary authority.

53. In the alternative, relevant state law bans any such clause purporting to confer Guardian with discretionary authority.

54. At all times relative hereto, Guardian has been operating under an inherent and structural conflict of interest because any monthly benefits paid to Plaintiff are paid from Guardian's own assets with each payment depleting those same assets.

55. As the party obligated to pay benefits and the administrator given discretion in construing and applying the provisions of the disability plan and assessing Plaintiff's entitlement to benefits, Guardian is an ERISA fiduciary.

56. Under ERISA, a fiduciary must carry out its duties with respect to the plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent individual acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

57. Guardian failed to satisfy its duties under ERISA as specified in paragraph 56 of this complaint.

58. Under ERISA, a fiduciary should fully investigate the relevant and applicable facts of any claim.

59. Guardian failed to satisfy its duties under ERISA as specified in paragraph 58 of this complaint.

60. Under ERISA, a fiduciary should fairly consider all information obtained regarding a claim, including that which tends to favor claim payment or continuation as well as that which tends to favor claim declination or termination.

61. Guardian failed to satisfy its duties under ERISA as specified in paragraph 60 of this complaint.

62. Under ERISA, a fiduciary should consider the interests of its insured at least equal to its own and to resolve undeterminable issues in its insured's favor.

63. Guardian failed to satisfy its duties under ERISA as specified in paragraph 62 of this complaint.

64. Under ERISA, a fiduciary has the obligation to read, interpret and understand all of the pertinent medical information with sufficient clarity so as to be able to make a fair, objective and thorough evaluation of its insured's claims for disability benefits.

65. Guardian failed to satisfy its duties under ERISA as specified in paragraph 64 of this complaint.

66. Under ERISA, a fiduciary's denial of a claim should not be based on speculation.

67. Guardian failed to satisfy its duties under ERISA as specified in paragraph 66 of this complaint.

68. Under ERISA, a fiduciary should be objective in its assessment of facts and not attempt to bias the claims investigation process in any manner.

69. Guardian failed to satisfy its duties under ERISA as specified in paragraph 68 of this complaint.

70. Under ERISA, a fiduciary should not take into consideration the amount of money it would save if a particular claim or set of claims is denied, terminated, or otherwise not paid.

71. Guardian failed to satisfy its duties under ERISA as specified in paragraph 70 of this complaint.

72. Under ERISA, a fiduciary should refrain from excessive reliance on in-house medical staff to support the denial, termination, or reduction of benefits.

73. Guardian failed to satisfy its duties under ERISA as specified in paragraph 72 of this complaint.

74. Under ERISA, a fiduciary should not conduct unfair evaluation and interpretation of attending physicians' or independent medical examiners' reports.

75. Guardian failed to satisfy its duties under ERISA as specified in paragraph 74 of this complaint.

76. Under ERISA, a fiduciary should evaluate the totality of its insured's medical conditions.

77. Guardian failed to satisfy its duties under ERISA as specified in paragraph 76 of this complaint.

78. Under ERISA, a fiduciary has an obligation to conduct a fair, thorough, and objective review.

79. Guardian failed to satisfy its duties under ERISA as specified in paragraph 78 of this complaint.

## CAUSE OF ACTION
## FOR PLAN BENEFITS AGAINST ALL DEFENDANTS
## PURSUANT TO 29 U.S.C. § 1132(a)(1)(B)

**PLAINTIFF** incorporates all the allegations contained in paragraphs 1 through 79 as if fully stated herein and says further that:

80. Under the terms of the Plan, Defendant agreed to provide Plaintiff with long term disability benefits in the event that Plaintiff became disabled as defined in the Plan.

23

81. Plaintiff is disabled under the terms of the Plan.

82. Defendant failed to provide benefits due under the Plan, and this denial of benefits to Plaintiff constitutes a breach of the Plan.

83. The decision to deny benefits was wrong under the terms of the Plan.

84. The decision to deny benefits and decision-making process were arbitrary and capricious.

85. The decision to deny benefits was not supported by substantial evidence in the record.

86. The decision-making process did not provide a reasonable opportunity to the Plaintiff for a full and fair review of the decision denying the claims, as is required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1.

87. The appellate procedures did not provide the Plaintiff a full and fair review.

88. As an ERISA fiduciary, the Defendant owed the Plaintiff fiduciary duties, such as an obligation of good faith and fair dealing, full and complete information, and a decision-making process free of influence by self-interest.

89. The Defendant violated the fiduciary duties owed to the Plaintiff.

90. As a direct and proximate result of the aforementioned conduct of the Defendant in failing to provide benefits for Plaintiff's disability and in failing to provide a full and fair review of the decision to deny benefits, Plaintiff has been damaged in the amount equal to the amount of benefits to

which Plaintiff would have been entitled to under the Plan, and continued benefits payable while the Plaintiff remains disabled under the terms of the Plan.

91. As a direct and proximate result of the aforementioned conduct of the Defendant in failing to provide benefits for Plaintiff's disability, Plaintiff has suffered, and will continue to suffer in the future, damages under the Plan, plus interest and other damages, for a total amount to be determined.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant her the following relief in this case:

1. A finding in favor of Plaintiff against Defendant;

2. Damages in the amount equal to the disability income benefits to which she was entitled through date of judgment, for unpaid benefits pursuant to 29 U.S.C. § 1132(a)(1)(B);

3. Prejudgment and postjudgment interest;

4. An Order requiring Defendant to pay continuing benefits in the future so long as Plaintiff remains disabled under the terms of the Plan;

5. An Order requiring the Defendant and/or Plan to provide Plaintiff with any other benefits to which she would be entitled pursuant to a finding that she is disabled under the Plan;

25

6. Plaintiff's reasonable attorney fees and costs; and

7. Such other relief as this Court deems just and proper.

Dated this 21st day of September, 2022.

Respectfully submitted,

BY:  */s/D. Seth Holliday*
D. SETH HOLLIDAY
**MCMAHAN LAW FIRM, LLC**
700 S. Thornton Avenue
P.O. Box 1607
Dalton, Georgia 30722
(706) 217-6118
sholliday@mcmahanfirm.com

*Attorneys for Plaintiff*